**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INVESTMENT PROPERTY REALTY GROUP, LLC; | |
| *Plaintiff*, | **VERIFIED COMPLAINT** |
| v. | 22-cv-_____ |
| BLOCK REAL ESTATE GROUP LLC, SEAN MASHIHI, GABRIEL KATES, DANIEL SHAWAH, and SERGE SARKISIAN; | **Jury Trial Demanded** |
| *Defendants*. | |

Plaintiff Investment Property Realty Group ("IPRG"), through its undersigned counsel, Blank Rome LLP, submits this Verified Complaint against Defendants Sean Mashihi, Gabriel Kates, Daniel Shawah, Serge Sarkisian (collectively, "Individual Defendants"), and Block Real Estate Group LLC ("Block" and together with the Individual Defendants, "Defendants"), and states and alleges as follows:

## INTRODUCTION

1. This is an action for breach of restrictive covenants, misappropriation of trade secrets, and related torts, by real estate brokers seeking to profit from the success, goodwill, and hard work of an existing prominent commercial real estate brokerage rather than put in the sweat to develop a business and reputation of their own.

2. The factual allegations below present an all-too-familiar fact pattern in trade secrets cases: the story of a successful company that gives its personnel opportunity and access to its processes, industry contacts, and valuable data, only to be repaid with treachery, when the employees steal proprietary data amassed over decades of careful market data and research, form

a competing venture, and seek to poach their former employer its real estate sales people and business opportunities using the purloined trade secrets.

3.    This action is set in the ultra-competitive commercial real estate brokerage market in New York City. This is a business in which information is currency; the best brokerages curate information through extensive amounts of time and effort, determination, organization, grit and skill, and those with the best information have an actual advantage which allows them to win business.

4.    Over the years, IPRG has built a reputation as a significant player in the industry. IPRG's success is due in large part to its emphasis on superior market data, in depth market research and analysis of market trends, sales data, accurate and usable market participant contact information, all-encompassing building data, contact profiles, all of which is contained in well organized and sophisticated reporting functionality. IPRG maintains its valuable market analysis and research in a proprietary database on which its brokers depend for their and IPRG's success. This valuable tool equips IPRG agents with the premier resources needed to be the most educated and capable in the commercial real estate market. The value of this database, and its reputation in the industry, has helped IPRG attract new talent and grow significantly in recent years, gaining market share.

5.    All real estate agents, employees, and contractors at IPRG are required to execute agreements which collectively recognize IPRG's interest in its database and other proprietary information and protects IPRG from existing agents soliciting IPRG personnel to work for competing brokerages.

6.     On May 17, 2022, Defendants Mashihi and Kates – two IPRG real estate agents at the time – surreptitiously formed a competing real estate brokerage business, Block, while they were still engaged as agents by IPRG.

7.     Before they exited IPRG, on June 28, 2022 and July 6, 2022, Mashihi and Kates conspired with others (including an IPRG database analyst, Sarkisian) to unlawfully obtain raw exports of downloaded excel data from IPRG's proprietary, confidential, and trade secret database containing the central spine of key market information around which the IPRG business operates. Mashihi and Kates then proceeded to boast about their access to the stolen database as a draw to solicit other IPRG brokers to join them, offering purportedly higher teaser commissions while providing the brokers the exact database of information on which they depend at IPRG.

8.     Defendant Shawah, another IPRG agent, who, upon information and belief, was solicited by Block (and its principals) with the IPRG-data pitch, departed several months later. Like Mashihi and Kates, Shawah went to Sarkisian to export downloads of IPRG's valuable, proprietary, confidential, and trade secret database, in raw excel form, with data records reflecting this information being downloaded and transferred by Sarkisian merely hours before Shawah announced he was leaving IPRG to work for a competitor.

9.     Defendants' clandestine scheme was only recently exposed in October 2022, and a subsequent investigation of IPRG computers and software utilization audit logs have yielded corroborative proof of Defendants' unlawful scheme to build their competing business on stolen information from IPRG, with active and willful efforts to cover up the scheme.

10.     The law protects IPRG from such brazen acts of corporate sabotage and theft, which have led to substantial and ongoing reparable and irreparable harm to IPRG.

**PARTIES**

11.     Plaintiff IPRG (formerly known as *"Bestreich Realty Group"* or "BRG") is a Delaware limited liability company duly authorized to transact business in New York, with a principal place of business located at 45 Broadway, 29th Floor, New York, New York.

12.     Defendant Block is a New York limited liability company, with a principal place of business located at 401 Park Avenue South, 10th Floor, New York, New York.

13.     Defendant Sean Mashihi is an individual who resides at 266 East 78th Street, New York, New York.

14.     Defendant Gabriel Kates is an individual who resides at 150 Ludlow Street, Apt. 1C, New York, New York.

15.     Defendant Daniel Shawah is an individual who resides at 34 Ridgeway Road, Easton, Connecticut.

16.     Defendant Serge Sarkisian is an individual who resides at 60-34 Gates Avenue, Queens, New York.

**JURISDICTION AND VENUE**

17.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because IPRG asserts a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, as amended, as these facts involve taking, transfer, appropriation, use and dissemination of information in interstate commerce, both physically across state lines and for use in soliciting customers in interstate commerce (including potential buyers from outside of New York using financing from outside of New York) and personnel of IPRG in interstate commerce.

18.     This Court has supplemental jurisdiction over the state law claims alleged in this Complaint under 28 U.S.C. § 1367, which form part of the same case or controversy as the DTSA claim.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because one or more of Defendants are subject to personal jurisdiction in the Southern District of New York, a substantial part of the events or omissions giving rise to these claims occurred in the Southern District of New York, where the IPRG principal place of business is located, and where secrets were at least, in part, were stolen and misappropriated.

20.     This Court has personal jurisdiction over Defendants Mashihi, Kates, Block, and Sarkisian because each individual resides and regularly conducts business in New York.

21.     The Court has personal jurisdiction over Defendant Shawah because he regularly transacts business within New York (including as a contractor for IPRG), transacts to provide brokerage services in New York, committed a tortious act within the state, and has purposefully availed himself of the privileges and benefits of the laws of the state of New York, and has engaged in acts within New York that have caused injury to IPRG in New York.

## FACTS

### A.     IPRG's Real Estate Brokerage Business

22.     Founded in 2015 as Bestreich Realty Group, IPRG is a market leading real estate investment sales brokerage and advisory firm in the commercial real estate market in the New York City metropolitan area.

23.     IPRG has an established and well-known reputation as a trusted source in brokerage with an in-depth, block-by-block, knowledge of the New York City investment market.

24.     Since its founding, IPRG has completed over 500 sales across the five boroughs exceeding $1 billion in value, servicing buyers and sellers in New York City and from across the country and globe.

25.     IPRG specializes in the sale and advisory of multifamily, mixed-use, and development-site properties.

26.     IPRG's expert brokers provide strategic guidance to best navigate sales and leasing processes to achieve optimal results for clients, as well as transparent and accurate property valuations for property owners to unlock the true value of their investment.

27.     IPRG's success is attributable to its in-depth proprietary database, which equips its brokers and salespersons with premier market intelligence needed to be the most educated in the commercial real estate market.

28.     IPRG's platform utilizes a combination of people and technology, giving clients resources they need to achieve their real estate goals.

29.     One of IPRG's key points of differentiation from its competitors is a proprietary shared information database (the "SID") it built over years, which allows its entire brokerage team to input and track sales and property records, including in depth and accurate property ownership information, throughout the New York City area.

30.     The SID is built on a Salesforce® platform and draws from data hosted on IPRG servers both on-site and in the cloud. The SID includes a client relationship manager ("CRM") which tracks clients and potential client interactions, and information and can be used to disseminate potential property sales, recent successes, or other marketing information to targeted audiences generating meaningful business.

31.     The SID is so extensive and sprawling that IPRG employs a full-time staff to curate and administer the SID for various IPRG business initiatives, as well as four outsourced data analysts, who analyze and scrub data to ensure accuracy, and an external consultant who manages the architecture of the database.

32.     The SID is valuable to both clients and IPRG because with this comprehensive set of proprietary data, from owner histories, potential owner interest, prior feedback from owner or buyer interactions over years, non-public IPRG broker notes, existing outstanding offers designating imminent potential sales, and more.

33.     An IPRG broker can run queries or reports on the SID for anything a client requests, whether a mixed-use property in a specific neighborhood or access to a network of buyers and capital. IPRG through its SID can make unforeseen matches between buyers and sellers in the market and create opportunities and successful transactions seamlessly. With its SID, IPRG brokers who get a listing have the cutting-edge insider information they need to make a sale.  The value of this information depends on its confidentiality and use by IPRG personnel only.

34.     As explained throughout this pleading, IPRG takes extensive measures to maintain the confidentiality and security of the SID and the secrecy of the valuable data compilations and analyses it provides to IPRG brokers.

**B.     IPRG's Protection Of Its Valuable Business Assets**

35.     IPRG uses contractual, electronic, and physical means to protect and safeguard its valuable business assets, including its proprietary, confidential and trade secret information, including, without limitation, the SID, and its independent contractor and employee relationships.

**1.     The Sales Associate Independent Contractor Agreement**

36.     IPRG agents, including Defendants Mashihi, Kates, and Shawah, are required as a condition of engagement with IPRG to execute Sales Associate Independent Contractor

Agreements ("Associate Agreements"). Copies of Defendants Mashihi, Kates, and Shawah's Associate Agreements are attached as **Exhibits 1-3**, respectively.

37.    The Associate Agreements contain provisions designed to protect IPRG's investments in both its valuable human resources and its proprietary, confidential, and trade secret information.

38.    With respect to IPRG's proprietary, confidential, and trade secret information, the Associate Agreement includes both "Confidentiality" and "Broker Property" provisions detailing the scope of IPRG's proprietary, confidential, and trade secret information and IPRG's sales associates' obligation not to use, disclose, or retain this information following termination of their engagement with IPRG.

39.    The "Confidentiality" provision states:

> Sales Associate shall not use or disclose, or authorize any other person or entity to use or disclose, any of [IPRG]'s Confidential Information (defined below), other than as necessary to further the business objectives of [IPRG]. [IPRG]'s obligations under this Section shall survive the termination of this Agreement or any provision hereof or thereof.

Associate Agreement, ¶ 10(a).

40.    The definition of IPRG's "Confidential Information" in the Associate Agreement includes, but is not limited to:

> all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, materials, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information,

> marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, fee splitting arrangements, team fee split agreements, territorial fee arrangements, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, … designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, client information, client lists, manufacturing information, … and buyer lists of [IPRG] or its businesses, or of any other person or entity that has entrusted information to Broker in confidence. Sales Associate understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Associate Agreement, ¶ 10(b).

41.     Section 12 of the Associate Agreement, entitled "Broker Property," expands upon IPRG's sales associates' obligations to never disclose and not retain following termination of their engagement IPRG's valuable, proprietary, confidential, and trade secret information. Section 12 states:

> Sales Associate **shall not remove from [IPRG]'s premises** (except to the extent such removal is for purposes of the performance of the Services, or except as otherwise specifically authorized by [IPRG]) any document, record, notebook, plan, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Sales Associate recognizes that, as between [IPRG] and Sales Associate, **all of the Proprietary Items, whether or not developed by Sales Associate, are the exclusive property of [IPRG].** Upon termination of this Agreement by either party, or upon the request of [IPRG], **Sales Associate shall return to [IPRG] all of the Proprietary Items in Sales Associate's possession or subject to Sales Associate's control, and Sales Associate shall not retain any copies, reproductions, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.** During and after the performance of services for the Company, you agree that all memoranda, notes, lists, data, records,

9

> property and any other tangible products and documents (and all copies thereof) made, produced or compiled by you or made available to you concerning the business of [IPRG], including any electronic data brought by you to [IPRG] that has been modified and/or integrated into [IPRG]'s records, shall be [IPRG]'s sole property and shall be delivered to [IPRG] at any time on request.

Associate Agreement, ¶ 12 (emphasis added).

      42.    With respect to IPRG's relationships with its brokers, independent contractors, and employees, the "Non-Interference" section of the Associate Agreement states:

> To facilitate [IPRG]'s protection of its investment in its relationships with its independent contractors and employees, during the term of this Agreement and for a period of twelve (12) months thereafter, Sales Associate agrees and covenants not to:
>
> (i) directly or indirectly solicit, employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who is or was an employee of [IPRG] at any time during the term of this Agreement or in any manner induce or attempt to induce any employee of [IPRG] to terminate his or her employment with [IPRG]; or
>
> (ii) interfere with the [IPRG]'s relationship with any person who during the term of this Agreement was an employee, or independent contractor of [IPRG].

Associate Agreement, ¶ 11(b).

      43.    In the event of breach of the obligations set forth in the Associate Agreement, IPRG brokers, including Defendants Mashihi, Kates, and Shawah, agreed that each:

> …shall defend, indemnify and hold harmless [IPRG] and its affiliates and their members, officers, directors, employees, agents, successors and permitted assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from: . . . Sales Associate's breach of any representation, warranty or obligation under this Agreement.

Associate Agreement, ¶ 13(a).

### 2. The Confidentiality and Inventions Agreement

44.     Non-broker employees of IPRG, including IPRG's "Data Entry Specialist," Defendant Sarkisian, are required as a condition of employment to execute Confidentiality and Inventions Agreements (the "Confidentiality Agreement"). A copy of Defendant Sarkisian's Confidentiality Agreement is attached as **Exhibit 4**.

45.     The Confidentiality Agreement defines IPRG's "Confidential Information" the same as the Associate Agreement and likewise prohibits IPRG employees both during and after employment from using or disclosing any Confidential Information. *See* Confidentiality Agreement, ¶ 1.

46.     The Confidentiality Agreement also contains a provision requiring IPRG employees to return and not retain IPRG' Confidential Information following termination of employment. *See* Confidentiality Agreement, ¶ 7.2.

47.     With respect to IPRG's relationships with its brokers, independent contractors, and employees, the Confidentiality Agreement contains similar restrictions to the Associate Agreement on solicitation of IPRG personnel both during employment and for twelve months after. *See* Confidentiality Agreement, ¶ 5.

### 3. The IPRG Policy Manual

48.     IPRG also issues to its brokers a "Policy Manual: Independent Contractor Sales Associates" (the "Broker Manual") and to its employees, a "Policy Manual: Employees" (the "Employee Manual") copies of which are attached as **Exhibits 5 and 6**, respectively.

49.     The Broker Manual expands upon the competitively sensitive nature of IPRG's valuable proprietary, confidential, and trade secret information to which its brokers have access:

> All sales associates are expected to ***use extreme caution to ensure that Firm confidential information and the confidential information of our clients remains confidential***, and does not

become available to anyone inside or outside of the Firm who is not entitled to know it.

Due to the nature of our business, sales associates have access to a broad range of confidential information that must be protected. By way of example and not limitation, confidential information includes:

- Non-public information about our clients, including motivation and all financial information.

- Our marketing plans and strategies;

- Our costs, funding, and the methods we use to determine the price of listings, etc.;

- Our internal initiatives, strategies, processes, and methods; and

- Confidential information which sales associates may obtain concerning our employees, including personnel files, personnel evaluations, and the like.

Ex. 5 at 12 (emphasis added)

50.     The Broker Manual further states:

Confidential information **may not be used or disclosed** by sales associates **unless such use or disclosure is required by their services on behalf of [IPRG].** Confidential information as described in this policy is the exclusive property of [IPRG] with all proprietary rights and under no circumstances whatsoever shall sales associates have any rights to use, disclose, or publish to others such confidential information during or after their affiliation with [IPRG].

*Id.* (emphasis added).

51.     The Broker Manual also includes detailed provisions on the use, handling, and storage of IPRG's business information, stating, *inter alia*, that "confidential or proprietary information should be stored on [the IPRG] network, which provides safeguards for protecting information, and should not be stored on a local hard drive, desktop, disk, or portable drive." *Id.*

52.     The Broker Manual also lists various precautionary measures that "must also be taken in regards to the physical security of [IPRG]'s information technology that may contain confidential information." Broker Manual at 13 (listing measures).

53.     Like the Broker Manual, the Employee Manual contains detailed provisions regarding the protection of IPRG's proprietary, confidential, and trade secret business information. *See* Ex. 6 at 16.

### 4.     Protection of IPRG's Physical Office and Computer Network

54.     To protect its proprietary, confidential, and trade secret business information, IPRG has implemented numerous physical security measures. For example, IPRG's physical facilities are locked and monitored by 24-hour security systems. Entry to and exit from IPRG facilities are controlled, and access is allowed only to authorized individuals.

55.     IPRG's electronic records and information are accessible via IPRG's secure computer network. Access to that network is limited to IPRG personnel and the network is password protected and monitored by IPRG.

### C.     The Individual Defendants' Employment History with IPRG

56.     Defendants Mashihi, Kates, and Shawah each were engaged by IPRG as sales associates or brokers.

57.     Each regularly relied on IPRG's proprietary, confidential, and trade secret information, including the SID, to perform their duties as IPRG brokers.

58.     Defendant Mashihi worked as an IPRG broker from February 22, 2021 until June 30, 2022, when resigned. Mashihi focused primarily on multifamily and mixed-use properties while with IPRG.

59.     Defendant Kates worked as an IPRG broker from December 7, 2017 until July 6, 2022, when he resigned along with Defendant Mashihi. Kates's primary focuses at IPRG were multifamily, mixed-use, and development site properties.

60.     Defendant Shawah worked as an IPRG broker from January 2, 2019 until October 3, 2022, when he, too, resigned from IPRG, by verbally informing IPRG's principals as soon as they arrived at the office of his intent to leave. Shawah covered multifamily, mixed-use, and development site properties.

61.     Defendant Sarkisian was employed as an Investment Analyst with IPRG from March 8, 2016 until he was involuntarily terminated on October 13, 2022, following discovery of his wrongdoing as described herein. As an Investment Analyst, Sarkisian was responsible for curating the SID and organizing and exporting data for use on IPRG marketing blasts. Sarkisian was primarily responsible for data entry, data integrity, and data maintenance for the SID.

**D.     Mashihi and Kates Form a Competing Brokerage, Block Real Estate Group**

62.     Upon information and belief, Defendants Mashihi and Kates formed a competing commercial real estate brokerage, Block, on May 17, 2022, while they were still engaged as brokers by IPRG.

63.     According to Block's website (www.blocknewyork.com), Mashihi and Kates are "Co-Founders" and "Managing Principals" of Block.

64.     Since Defendants Mashihi and Kates left IPRG to dedicate themselves full-time to Block, they have solicited other IPRG brokers to join them at Block in patent violation of their non-solicitation obligations in their respective Associate Agreements, as explained in detail below. They, in fact, hired away from IPRG a broker at the outset of their new venture.

65.     On October 3, 2022, Defendant Shawah resigned from IPRG to join another competing brokerage.

66.     IPRG is informed and believes that Defendants Mashihi and Kates, are actively soliciting IPRG brokers to join Block, boasting of higher commission splits and making what appeared to be an outrageous claim that they had in their possession IPRG's valuable, proprietary, confidential and trade secret database, the SID.

67.     Block has sold one or more transactions that IPRG previously was actively brokering prior to their sale through Block.

68.     Upon information and belief, Defendants have brokered the sale of multiple properties utilizing the IPRG's confidential and trade secret information, including the SID, and are actively marketing and selling properties using this information.

**E.     IPRG Learns of Defendants' Intentional and Unlawful Scheme to Steal IPRG's Proprietary, Confidential, and Trade Secret Information**

69.     Just last week, IPRG first learned of a concerted scheme by Mashihi, Kates, and Shawah to conspire with Sarkisian to download and steal IPRG's proprietary, confidential, and trade secret information, including, without limitation the IPRG SID to utilize for the benefit of each of them and IPRG's competitors, including Block.

70.     Upon information and belief formed from discussions with direct witnesses and a review of IPRG records, Block proceeded to solicit (and upon information and belief, is continuing to solicit) multiple IPRG brokers to leave IPRG by explicitly pitching Block's access to IPRG's proprietary, confidential, and trade secret database, the SID, which Block bragged was procured through IPRG's Investment Analyst, Sarkisian for a mere $5,000. The circumstances surrounding the export and saving of the SID data reveals an intentional malicious scheme.

71.     Sarkisian arrived at IPRG's offices on October 3, 2022 at 6:33 a.m. as reflected by key fob data. An investigation reveals Sarkisian proceeded to download various database runs from SID, including onto external jump drive and onto a computer, marked in a folder inaccurately

denoted "Private Wedding Photos" – an explicit effort to hide the contents of the file. These files were then deleted from the computer and the reports were deleted from Salesforce by Sarkisian.

72.     Upon learning of these activities, IPRG immediately confronted Defendant Sarkisian, who admitted that both Defendants Kates and Shawah had approached him before their respective resignations on July 6, 2022 and October 3, 2022, respectively, asking that he email data from the SID to them, which Sarkisian admitted he did. Sarkisian claimed he had emailed certain files on IPRG emails to Kates and Shawah (a search of the IPRG emails revealed no such emails, contradicting Sarkisian's claims). Sarkisian further admitted that he "hangs out" with the Individual Defendants regularly following their IPRG departure, including as recently as the preceding night he had been at Kates' Ludlow Street apartment "watching movies and playing games."

73.     IPRG terminated Defendant Sarkisian on Thursday, October 13, 2022.

74.     IPRG also conducted an initial investigation of the information within its possession and control, revealing unauthorized and unusual exports from the SID and download data on IPRG computers, as well as clear appropriation of data in the Salesforce® audit logs.

75.     This initial investigation revealed downloads, outside the ordinary course of business, of substantial data from the SID on June 28, 2022—immediately preceding Defendants Mashihi and Kates' resignations from IPRG—with updated and supplemental files downloaded on September 7, 2022, September 30, 2022 and October 3, 2022. A screenshot of the data exports from Defendant Sarkisian's IPRG workstation is attached as **Exhibit 7**.

76.     The June 2022 downloads from the SID were stored as "Private Wedding Photos" on Defendant Sarkisian's IPRG workstation. None of the files so stored consist of wedding photos and, upon information and belief, Mr. Sarkisian is not married and lives at home with his parents.

77. The downloaded files also showed that they had been exported to a "D Drive." IPRG does not have a "D Drive" and believes that Defendant Sarkisian and his co-Defendants and co-conspirators used portable external drives or "jump drives" to steal IPRG's proprietary, confidential, and trade secret information and remove it from IPRG's offices.

78. IPRG's initial investigation further revealed that, on October 3, 2022 – the day of Defendant Shawah's resignation from IPRG – Defendant Sarkisian downloaded files from the SID between 7:48 a.m. and 8:38 a.m. and save them as "Private Wedding Photos." Defendant Sarkisian's shift at IPRG was from 9:00 a.m. to 5:00 p.m. and he was not an employee who arrived early for work as can be verified from his key fob entry history.

**F.  IPRG Cease and Desist Letters to Defendants**

79. On Thursday, October 13, 2022, IPRG delivered by email and overnight delivery cease and desist letters to each of the Defendants demanding, among other things, that they:

> a. Cease and desist any further violation of their contractual obligations to IPRG, including solicitation of IPRG brokers and employees;
>
> b. Identify all IPRG business information in their possession, custody or control;
>
> c. Identify all persons to whom they have disclosed IPRG's business information; and
>
> d. Identify all listings, proposed listings, offers, and transactions in which they have used or otherwise relied upon IPRG business information.

See **Exhibit 8** (attached composite exhibit of cease and desist letters.)

80. IPRG advised each Defendant of their duty to preserve relevant information and demanded that they comply with IPRG's demands by Tuesday, October 18, 2022.

81.    IPRG warned Defendants that their failure to comply with IPRG's demands would result in IPRG bringing legal action against them to protect its rights.

82.    Each of the Defendants failed to timely respond to the cease and desist letter.

83.    Defiantly, following the cease and desist, Shawah, blasted the market, utilizing the IPRG stolen CRM to target recipients, with a promotional email announcing that his new employer "*is pleased to welcome DANIEL SHAWAH as a senior broker specializing in Investment Sales*." This email blast went to the personal email account of an IPRG principal, which private email address was only available on IPRG's SID. IPRG has confirmed with several clients that they, too, received this email blast from Shawah.

## COUNT I
## BREACH OF CONTRACT

### (Against Defendant Mashihi)

84.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

85.    Defendant Mashihi entered into a series of valid and binding agreements with IPRG including the Associate Agreement and Broker Manual. IPRG has performed all of its obligations under these respective agreements.

86.    Defendant Mashihi breached multiple agreements by:

a.    among other acts, soliciting multiple IPRG brokers to terminate their engagement with IPRG and/or join Defendant Mashihi's competing venture, (Block) an/or other entities that compete with IPRG and otherwise interfering with IPRG's relationships with individuals that were employees and/or independent contractors of IPRG during the term of Mashihi's employment with

IPRG in violation of the Associate Agreement's "Non-Interference" provisions, among other provisions.

b.  retaining and/or obtaining unlawfully IPRG's proprietary, confidential, and trade secret business information in violation of the Associate Agreement's "Confidentiality" and "Broker Property" provisions, among other provisions.

c.  failing to exercise "extreme caution" with respect to the use, disclosure, handling, storage, physical security, and protection of confidential information and information technology in violation of Broker Manual Arts. 12, 13, 16, among other provisions.

87.    As a result of Defendant Mashihi's breaches, IPRG is entitled to damages in an amount to be determined at trial in an amount of no less than $1 million, and is separately entitled to a permanent injunction to prevent irreparable harm, as well as indemnification pursuant to Associate Agreement Art. 13(a) and attorneys' fees, costs, expenses and interest.

## COUNT II
## BREACH OF CONTRACT

### (Against Defendant Kates)

88.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

89.    Defendant Kates entered into a series of valid and binding agreements with IPRG including the Associate Agreement and Broker Manual. IPRG has performed all of its obligations under these respective agreements.

90.    Defendant Kates breached multiple agreements by:

a.  among other acts, soliciting multiple IPRG brokers to terminate their engagement with IPRG and/or join Defendant Mashihi's competing venture,

(Block) an/or other entities that compete with IPRG and otherwise interfering with IPRG's relationships with individuals that were employees and/or independent contractors of IPRG during the term of Mashihi's employment with IPRG in violation of the Associate Agreement's "Non-Interference" provisions, among other provisions.

b.  retaining and/or obtaining unlawfully IPRG's proprietary, confidential, and trade secret business information in violation of the Associate Agreement's "Confidentiality" and "Broker Property" provisions, among other provisions.

c.  failing to exercise "extreme caution" with respect to the use, disclosure, handling, storage, physical security, and protection of confidential information and information technology in violation of Broker Manual Arts. 12, 13, 16, among other provisions.

91.     As a result of Defendant Kate's breaches, IPRG is entitled to damages in an amount to be determined at trial in an amount of no less than $1 million, and is separately entitled to a permanent injunction to prevent irreparable harm, as well as indemnification pursuant to Associate Agreement Art. 13(a) and attorneys' fees, costs, expenses and interest.

**COUNT III**
**BREACH OF CONTRACT**

**(Against Defendant Shawah)**

92.     IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

93.     Defendant Shawah entered into a series of valid and binding agreements with IPRG including the Associate Agreement and Broker Manual. IPRG has performed all of its obligations under these respective agreements.

94.     Defendant Shawah breached multiple agreements by:

a.   among other acts, interfering with IPRG's relationships with individuals that were employees and/or independent contractors of IPRG during the term of Mashihi's employment with IPRG in violation of the Associate Agreement's "Non-Interference" provisions, among other provisions.

b.   retaining and/or obtaining unlawfully IPRG's proprietary, confidential, and trade secret business information in violation of the Associate Agreement's "Confidentiality" and "Broker Property" provisions, among other provisions.

c.   failing to exercise "extreme caution" with respect to the use, disclosure, handling, storage, physical security, and protection of confidential information and information technology in violation of Broker Manual Arts. 12, 13, 16, among other provisions.

95.     As a result of Defendant Shawah's breaches, IPRG is entitled to damages in an amount to be determined at trial in an amount of no less than $1 million, and is separately entitled to a permanent injunction to prevent irreparable harm, as well as indemnification pursuant to Associate Agreement Art. 13(a) and attorneys' fees, costs, expenses and interest.

## COUNT IV
## BREACH OF CONTRACT

### (Against Defendant Sarkisian)

96.     IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

97.     Defendant Sarkisian entered into a series of valid and binding agreements with IPRG including the Confidentiality Agreement and Employee Manual. IPRG has performed all of its obligations under these respective agreements.

98.     Defendant Sarkisian breached the Confidentiality Agreement's "Non-Solicitation" provision by soliciting IPRG brokers to terminate their engagement with IPRG and join Defendant Block.

a.  violating the restrictions on treatment of Confidential Information and solicitation of IPRG personnel, including, without limitation under Confidentiality Agreement Arts 5, and 7.2, among other provisions.

b.  failing to exercise "extreme caution" with respect to the use, disclosure, handling, storage, physical security, and protection of confidential information and information technology in violation of Employee Manual Art. 16 among other agreements.

99.     As a result of Defendant Sarkisian's breaches, IPRG is entitled to damages in an amount to be determined at trial in an amount of no less than $1 million, and is separately entitled to a permanent injunction to prevent irreparable harm, and attorneys' fees, costs, expenses and interest.

**COUNT V**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**

**(Against All Defendants)**

100.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

101.    IPRG is the owner of the SID database and the proprietary, confidential, and other business information contained therein and maintained its regular course which are described generally above and comprise financial, business, technical, and/or economic information and that accordingly constitute "trade secrets" under 18 U.S.C. § 1839(3) (the "Trade Secrets").

102.    The trade secrets are used in or intended for use in interstate and international commerce, including to target, market, and broker New York real estate transaction from buyer's throughout and without the United States, utilizing financing and equity sources throughout and without the United States.

103.    IPRG has taken reasonable steps to maintain the secrecy of its Trade Secrets as described above, including through use of contractual restrictive covenants restricting use of the Trade Secrets, strict IPRG policies protecting the Trade Secrets, and physical and electronic security measures to safeguard the Trade Secrets from unauthorized disclosure.

104.    These confidential and proprietary Trade Secrets derive independent economic value from not being generally known to the public or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on IPRG over others in the relevant market. The confidential customer lists, targeting of open "offers" for likely seller or buyers, broker notes on the property histories, owner decisionmaker information, potential interested parties, and comparable sales, which has been compiled by IPRG through years of research and data collection provides a competitive edge over IPRG's competitors. Indeed, the independent economic value of these Trade Secrets is confirmed, in part, by Defendants engaging in outrageous, clandestine conduct in order to steal them to build a competing business venture and affirmatively using the Trade Secrets as part of the 'sales pitch' to recruit other brokers.

105.    Other than through Defendants' improper theft and misappropriation, the Trade Secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.  The SID cannot be replicated or procured through

publicly available means as it was compiled through personal interactions, notes, and feedback from IPRG personnel over years, as well as the compilation and analysis.

106.    Defendants' acts including the procurement by improper means, unauthorized use and dissemination of Trade Secrets constitutes misappropriation because, among other reasons, at the time of such theft, use, and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to IPRG to maintain the secrecy of the Trade Secrets.

107.    Defendants breached and/or induced other to breach Mashihi, Kates, Shawah, and Sarkisian's duty to maintain the secrets of the Trade Secrets and used improper means to acquire IPRG's Trade Secrets by materially breaching these contractual obligations.

108.    Defendants' violations of the DTSA occurred on or after May 11, 2016, the date the DTSA was enacted.

109.    Defendants' current and continued misappropriation of IPRG's Trade Secrets is reckless and malicious. Defendants knew at the time of the theft, and know now, that the Trade Secrets were the proprietary, confidential, and trade secret business information of IPRG, as evidenced by the written representations in the agreements and policies, and active efforts to cover their tracks by deleting files and emails, engaging in these activities outside of business hours, saving files in misnamed folders, and lying about these activities to IPRG management.

110.    By reason of the above-alleged acts and conduct of Defendants, IPRG has been damaged, and it will continue to suffer great and irreparable harm and damage. Certain aspects of the harm will be difficult if not impossible to ascertain, and IPRG will be without an adequate remedy at law.

111.    IPRG has no adequate remedy at law to ameliorate the harm caused by the existing and continued misappropriation of IPRG's Trade Secrets. Accordingly, IPRG seeks preliminary and permanent injunctive relief under the DTSA, 18 U.S.C. § 1836(b)(3)(A) to prevent actual or threatened misappropriation of IPRG's Trade Secrets by the Defendants, and requires affirmative actions to protect IPRG's Trade Secrets.

112.    By reason of the foregoing, IPRG is also entitled to damages under 18 U.S.C. § 1836(b)(3)(B)(i) for the actual loss caused to IPRG by Defendants' misappropriation of the Trade Secrets and restitution and disgorgement of profits (including, without limitation, any funds received for selling the Trade Secrets and all commissions and other fees earned) arising out of Defendants use of IPRG's Trade Secrets in an amount to be determined at trial under 18 U.S.C. § 1836(b)(3)(B)(ii) in amount of no less than $2 million.

113.    In the alternative, in lieu of damages, IPRG is entitled to a reasonable royalty for Defendants unauthorized disclosure and/or use of IPRG's Confidential Information pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(ii) in an amount to be determined at trial.

114.    Defendants willfully and maliciously misappropriated IPRG's Trade Secret information in bad faith thus entitling IPRG to an award of exemplary damages in the form of doubling of the foregoing damages as well as attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)-(D).

## COUNT VI
## NEW YORK COMMON LAW MISAPPROPRIATION OF TRADE SECRETS

### (Against All Defendants)

115.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

116.    Under New York law, a "trade secret" is defined as any formula, pattern, device or compilation of information which is used in business, and which gives the user of such

misappropriated information and trade secrets the opportunity to obtain an advantage over competitors who do not know or use it.

117.    IPRG is the owner of the SID database and the proprietary, confidential, and other business information contained therein which are described and which have independent economic value and allow IPRG to gain an advantage over its competitors, and constitute trade secrets under New York law.

118.    Each of the Defendants acquired the Trade secrets by improper means, including breach of agreement, confidence or duty, or as a result of discovery by improper means.

119.    Here, each of the Individual Defendants engaged in conduct in breach of contractual and fiduciary duties to IPRG as part of a scheme to steal clandestinely IPRG's Trade Secrets for the benefit of themselves and Defendant Block.

120.    Block discovered and should have known IPRG's Trade Secrets have been, and are continuing to be used, for improper means.

121.    IPRG has taken reasonable steps to maintain the secrecy of its Trade Secrets as described above, including use of contractual, policy, and physical and electronic measures to safeguard them from unauthorized disclosure.

122.    These confidential and proprietary Trade Secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on IPRG over others in the relevant market. Indeed, the independent economic value of these Trade Secrets is confirmed, in part, by Defendants engaging in outrageous, clandestine conduct in order to steal them to build a competing business venture.

123.    Other than through Defendants' improper theft and misappropriation, the Trade Secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

124.    It is inequitable and unjust for Defendants to retain IPRG's Trade Secrets, disclose the Trade Secrets to others, or to make use of the Trade Secrets for themselves, to the prejudice of IPRG.

125.    By reason of the above-alleged acts and conduct of Defendants, IPRG has been damaged, and it will continue to suffer great and irreparable harm and damage. Absent equitable relief, IPRG will be without an adequate remedy at law as to at least some of this harm.

126.    IPRG is also entitled to recover compensatory and exemplary (punitive) damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation, in an amount to be determined at trial.

## COUNT VII
## BREACH OF FIDUCIARY DUTY

### (Against Individual Defendants)

127.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

128.    Individual Defendants were agents of IPRG entrusted with proprietary, confidential, and trade secret information and have fiduciary duty under New York common law to IPRG to not act in a manner inconsistent with their agency and exercise a duty of good faith and loyalty to IPRG. Included within is the absolute duty to refrain from the use of confidential information acquired in the course of working for IPRG in competition with IPRG.

129.    Individual Defendants' fiduciary duties were not only created through their roles as agents of IPRG, but also arise through contractual affirmations in their respective Associate or Confidentiality Agreements and duties imposed by IPRG's Broker and Employee Manuals.

130.    Individual Defendants' fiduciary duties included obligations to avoid knowingly engaging in activities that are harmful to IPRG or that would otherwise undermine IPRG's business interests.

131.    Individual Defendants each breached these fiduciary duties by engaging in self-dealing, including a scheme to clandestinely steal and misappropriate IPRG's valuable, proprietary, confidential, and trade secret information, including the SID, and to induce IPRG employees to terminate their employment with IPRG and use this information to benefit themselves and Block directly in competition with IPRG.

132.    Sarkisian further breached his fiduciary duties by actively stealing IPRG Trade Secrets for the purpose of aiding parties in competition with IPRG while working for IPRG.

133.    As alleged above, each of the Individual Defendants engaged in activities while engaged as agents of IPRG to advance their unlawful and illegal scheme, all to the detriment of IPRG.

134.    By reason of breaches of fiduciary duty, IPRG has been harmed and is being harmed and therefore entitled to a constructive trust over the Trade Secrets and business assets of Block (including existing listings), restitution and disgorgement of profits, fees, or commissions gained by Defendants through use of the Trade Secrets, and award of damages all in amounts to be determined at trial, as well as injunctive relief to restrain use of the Trade Secrets, and attorneys' fees.

135.    The facts indicate a high degree of moral culpability, including, without limitation, affirmative efforts to actively conceal the wrongdoing and to coordinate the misappropriation with the exit of several IPRG agents and/or sell the Trade Secret information.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

136.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

137.    Under New York law, those who knowingly induce or participate in a fiduciary's breach of their fiduciary duty can be held jointly and severally liable as a joint tortfeasor.

138.    As explained above, including in the preceding Count VII, each of the Individual Defendants owed fiduciary duties to IPRG and each Individual Defendant and Block knew that IPRG agency and co-conspirators owed fiduciary duties to IPRG.

139.    Despite this knowledge, each Individual Defendant and Block engaged in conduct to induce the others to violate their fiduciary duties to IPRG as set forth herein, in advancement of their illegal scheme to steal IPRG's valuable, proprietary, confidential, and trade secret information, and knowingly participated in causing the breach of fiduciary duty.

140.    By reason of the above-alleged acts and conduct of Defendants, IPRG has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and IPRG will be without an adequate remedy at law.

141.    IPRG is also entitled to recover compensatory and exemplary (punitive) damages from the Individual Defendants, including but not limited to the losses resulting from their

wrongful conduct and any unjust enrichment caused by their unlawful and disloyal actions. The amount of such relief cannot be determined precisely at this time.

## COUNT IX
## UNJUST ENRICHMENT

### (Against Block)

142.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

143.    Block has been unjustly enriched at IPRG's expense by the beneficial use of the IPRG's Trade Secret and business information.

144.    Equity and good conscience require Block not to retain those benefits considering the relationships of the parties and the circumstances under which the benefits were received.

145.    As a result of the foregoing, Block has been unjustly enriched and IPRG is entitled to restitution in an amount to be determined at trial.

## COUNT X
## CONVERSION

### (Against All Defendants)

146.    IPRG restates and realleges all allegations in this Verified Complaint as if fully set forth in this paragraph.

147.    IPRG is the sole owner of its valuable, proprietary, confidential, and Trade Secret information, including, without limitation, the SID and the information contained therein with the sole possession right and interest therein.

148.    The Defendants, working in concert, have stolen IPRG's valuable, proprietary, confidential, and trade secret information, as described above, interfering with such rights and exercising dominion over the SID without authorization.

149.    The Defendants have collectively deprived IPRG of its right of property in its valuable, proprietary, confidential, and trade secret information, as described above, without IPRG's consent or authorization, excluding IPRG from its exclusive control of the Trade Secret information.

150.    As a result of such conversion, IPRG is also entitled to recover damages, statutory interest, and exemplary (punitive) damages in an amount to be determined at trial.

## RELIEF REQUESTED

**WHEREFORE**, IPRG respectfully requests judgment against Defendants as follows:

A.    Entry of a permanent injunction:

i.    restraining the Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling IPRG's proprietary, confidential, and trade secret information or other confidential proprietary information that may be determined not to be trade secret information and from obtaining any commercial advantage or unjust enrichment from their misappropriation of IPRG's proprietary, confidential, and/or trade secret information;

ii.    compelling the Individual Defendants to abide by their restrictive covenant agreements, including, without limitation, their respective obligations not to solicit IPRG personnel; and

iii.    enjoining and restraining Defendants during the pendency of this action from destroying, manipulating, or otherwise altering any evidence, including evidence that may reside on (or be embodied by changes to) any computer system, network, or other electronic means of data storage or transfer, relating in any way to the matters alleged in this Verified Complaint;

B.    Entry of a permanent injunction further requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to IPRG and not to retain

any and all of IPRG's trade secret and other confidential, proprietary materials that may be determined not to be trade secret information, including but not limited to any and all materials created incorporating or referencing IPRG's trade secrets and other confidential information,

      C.     Entry of award of damages as follows:

           i.     For actual and compensatory damages that IPRG is entitled to recover as a result of Defendants' actions;

           ii.     For incidental and consequential damages as permitted by law;

           iii.     For any statutory damages, including exemplary damages;

           iv.     For damages in the form of a constructive trust in the amount that Defendants have been unjustly enriched;

           v.     For an equitable accounting of all income, profits, and pecuniary benefits resulting from Defendants' conduct;

           vi.     For damages in the form of disgorgement in the amount Defendants profited from their wrongful activities;

           vii.     For damages for lost profits IPRG would have received but for the Defendants' conduct;

           viii.     For punitive damages to punish Defendants for their unlawful actions;

           ix.     For IPRG's attorneys' fees and costs;

           x.     Interest; and

           xi.     For any further relief the Court deems just and appropriate.

Dated: New York, New York               **BLANK ROME LLP**
       October 20, 2022

                             By: /s/ Craig Flanders
                               Craig Flanders
                               craig.flanders@blankrome.com

William R. Cruse
william.cruse@blankrome.com
Nicholas R. Tambone
nicholas.tambone@blankrome.com
1271 Avenue of the Americas
New York, New York 10020
Tel.: (212) 885-5000

*Attorneys for Plaintiff*
*Investment Property Realty Group, LLC*

## VERIFICATION

**DEREK BESTREICH** makes the following verification under 28 U.S.C. § 1746:

1.      I am the President of Plaintiff Investment Property Realty Group, LLC.

2.      I read the foregoing Verified Complaint, and I understand its contents.

3.      The factual statements and allegations in the Verified Complaint are true to the best of my knowledge, information, and belief.

4.      The source of my information, and the grounds for my belief, are my personal involvement in matters alleged in the Verified Complaint, my review of documents related to matters alleged in the Verified Complaint, my supervision of others, and my conversations with individuals related to matters alleged in the Verified Complaint.


I verify under penalty of perjury that the foregoing is true and correct.


Executed on October 19, 2022.                                      **DEREK BESTREICH**