**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

INVESTMENT PROPERTY REALTY GROUP,
LLC;

        *Plaintiff,*

        v.

BLOCK REAL ESTATE GROUP LLC, SEAN
MASHIHI, GABRIEL KATES, DANIEL
SHAWAH, and SERGE SARKISIAN;

        *Defendants.*

22-cv-_____

---

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

**BLANK ROME LLP**
Craig Flanders
craig.flanders@blankrome.com
William R. Cruse
william.cruse@blankrome.com
Nicholas R. Tambone
nicholas.tambone@blankrome.com
1271 Avenue of the Americas
New York, New York 10020
Tel.: (212) 885-5000

*Attorneys for Plaintiff*
*Investment Property Realty Group, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.     Overview of IPRG's Real Estate Brokerage Business...............................3

    B.     IPRG's Shared Information Database ("SID") .............................................4

    C.     IPRG's Protection Of Its Valuable Business Assets...................................5

        1.     The Sales Associate Independent Contractor Agreement ...............5

        2.     The Confidentiality and Inventions Agreement..............................6

        3.     The IPRG Policy Manual.................................................................6

        4.     Protection of IPRG's Physical Office and Computer
            Network...........................................................................................7

        5.     The Individual Defendants' Employment History with
            IPRG ...............................................................................................7

    D.     Mashihi and Kates Form a Competing Brokerage, Block Real
        Estate Group...............................................................................................8

    E.     IPRG Learns of Defendants' Intentional and Unlawful Scheme to
        Steal IPRG's Proprietary, Confidential, and Trade Secret
        Information ..................................................................................................9

    F.     IPRG Cease and Desist Letters to Defendants.........................................11

ARGUMENT ..................................................................................................12

    I.     It is Highly Likely that IPRG Will Succeed On Its Underlying Claims ...............13

    A.     IPRG's SID, and the information contained therein, are "trade
        secrets" under the DTSA and New York law .............................................14

        1.     IPRG takes extensive measures to secure, and maintain the
            confidentiality of, information stored on the SID.........................15

        2.     Information stored on the SID gives IPRG a competitive
            advantage because IPRG's competitors do not have access
            to the information..........................................................................16

    B.     The Defendants Misappropriated IPRG's Trade Secrets. ..........................17

    C.     IPRG is Highly Likely Like to Prevail on the Breach of Contract
        Claims .......................................................................................................19

D.      IPRG Is Highly Likely to Succeed on the Merits of Its Claims for Breach of Personnel Non-Solicitation Covenants......................................20

II.     IPRG Will Continue to Suffer Irreparable Harm Absent Injunctive Relief ...........22

III.    The Balance of the Equities and Public Interest Weigh Heavily In Favor of Injunction ...............................................................................................................23

IV.     A Temporary Restraining Order and Expedited Discovery Is Needed Pending a Hearing for Preliminary Injunction to Protect IPRG's Interests ...........24

        A.      Temporary Restraining Order on Use of Trade Secrets and Solicitation of IPRG Personnel ..................................................................24

        B.      Limited Expedited Discovery Should be Directed ...................................24

CONCLUSION ........................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdul Wali v. Coughlin,*
    754 F.2d 1015 (2d Cir. 1985) .............................................................................13

*Ashland Mgmt. v. Janien,*
    82 N.Y.2d 395 (1993) ........................................................................................14

*AUA Private Equity Partners, LLC v. Soto,*
    No. 1:17-cv-8035-GHW, 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) ................17

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382 (1999) ........................................................................................19

*Capstone Logistics Holdings, Inc. v. Navarrete,*
    No. 17-cv-4819 (GBD), 2018 U.S. Dist. LEXIS 216940
    (S.D.N.Y. Oct. 25, 2018) ..............................................................................12, 16

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.,*
    37 F. Supp. 2d 192 (E.D.N.Y. 1999) .................................................................20

*Delphine Software Int'l v. Elec. Arts, Inc.,*
    No. 99 CIV. 4454 AGAS, 1999 WL 627413 (S.D.N.Y. Aug. 18, 1999) .............25

*Entegee Inc. v. Korwek,*
    No. 3:15-cv-1087 (VLB), 2015 U.S. Dist. LEXIS 118263
    (D. Conn. Sept. 4, 2015) ...................................................................................12

*Ericmany Ltd. v. Agu,*
    2016 U.S. Dist. LEXIS 73016, 2016 WL 8711361 (E.D.N.Y. June 3, 2016) ........22

*Estee Lauder Companies Inc. v. Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ................................................................18

*ExpertConnect, L.L.C. v. Fowler,*
    No. 18 CIV. 4828 (LGS), 2019 WL 3004161 (S.D.N.Y. July 10, 2019) .........13, 14

*FMC Corp. v. Taiwan Tainan Giant Industrial Co.,*
    730 F.2d 61 (2d Cir. 1984) .................................................................................21

*Free Country Ltd v. Drennen,*
    235 F. Supp. 3d 559 (S.D.N.Y. 2016) ................................................................17

*Genesee Val. Trust Co. v. Waterford Group, LLC,*
    130 A.D.3d 1555 (4th Dep't 2015) .....................................................................20

*Global Telesystems, Inc. v. KPNQwest, N.V.*,
    151 F. Supp. 2d 478 (S.D.N.Y. 2001) ................................................................. 19

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020) ........................................................... 13, 14

*IBM Corp. v. De Freitas Lima*,
    No. 7:20-CV-04573 (PMH), 2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020),
    *aff'd*, 833 F. App'x 911 (2d Cir. 2021) ............................................................... 20

*Ime Watchdog, Inc. v. Safa Abdulrahim Gelardi*,
    No. 22-CV-1032 (PKC) (JRC) 2022 U.S. Dist. LEXIS 86997
    (E.D.N.Y. May 13, 2022) ..................................................................................... 24

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
    871 F. Supp. 709 (S.D.N.Y. 1995) ...................................................................... 21

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ................................................................. 23

*Jinno Int'l Co. v. Premier Fabrics, Inc.*,
    No. 12-CV-7820, 2013 WL U.S. Dist. LEXIS 129745
    (S.D.N.Y. May 24, 2013) ..................................................................................... 16

*Johnson Controls, Inc. v A.P.T. Critical Sys.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ................................................................. 21

*Johnson v. Nextel Communs., Inc.*,
    660 F.3d 131 (2d Cir. 2011) ................................................................................ 19

*Koylum, Inc. v. Peksen Realty Corp.*,
    272 F.3d 138 (2d Cir. 2001) ................................................................................ 11

*Kraus USA, Inc.*, 2020 WL 2415670 .......................................................................... 17

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
    83 F. Supp. 3d 501 (S.D.N.Y. 2015) ................................................................... 14

*Medidata Sols., Inc. v. Veeva Sys. Inc.*,
    No. 17 Civ. 589 (LGS), 2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ........... 14, 18

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
    409 F.3d 506 (2d Cir. 2005) ................................................................................ 12

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999) .................................................................................. 16

*Payment Alliance Intl., Inc. v. Ferreira,*
    530 F Supp. 2d 477 (S.D.N.Y. 2007)..............................................................19, 20

*Plaza Motors of Brooklyn, Inc. v. Bogdasarov,*
    No. 21-cv-6545 (KAM), 2021 U.S. Dist. LEXIS 230156
    (E.D.N.Y. Dec. 1, 2021) .............................................................................12, 15, 23

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Human Servs.,*
    510 F. Supp. 3d 29 (S.D.N.Y. 2020)..........................................................................22

*Renaissance Nutrition Inc. v. Kurtz,*
    2012 U.S. Dist. LEXIS 2490 (W.D.N.Y. 2012) ........................................................20

*Secured Worldwide LLC v. Kinney,*
    2015 U.S. Dist. LEXIS 44730 (S.D.N.Y. Apr. 1, 2015)............................................22

*Secured Worldwide LLC v. Kinney,*
    No. 15 Civ. 1761(CM), 2015 WL 1514738 (S.D.N.Y. Apr. 2015) ...........................21

*Shamrock Power Sales, LLC v. Scherer,*
    No. 12-CV-8959 (KMK), 2015 U.S. Dist. LEXIS 133650
    (S.D.N.Y. Sep. 30, 2015) ...........................................................................................14

*Stern v. Cosby,*
    246 F.R.D. 453 (S.D.N.Y. 2007) ...............................................................................24

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.,*
    2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021).............................................................23

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*
    749 F. Supp. 473 (S.D.N.Y. 1990) .............................................................................24

**Statutes**

18 U.S.C. § 1836...............................................................3, 12, 13, 15, 16, 17, 18, 19, 22

18 U.S.C. § 1836(b)(1) ......................................................................................................13

18 U.S.C. § 1836(b)(3)(a)(i) ..............................................................................................12

18 U.S.C. § 1836(b)(3)(A)(i)-(ii).......................................................................................22

18 U.S.C § 1839(3) ............................................................................................................14

18 U.S.C. § 1839(5) ...........................................................................................................17

18 U.S.C. §1839(5)(B)(ii)(I) ..............................................................................................17

18 U.S.C. §1839(5)(B)(ii)(III) ...........................................................................................17

18 U.S.C. § 1839(6)(A)...........................................................................................17

**Other Authorities**

Fed. R. Civ. P. 65.................................................................................................23

Fed. R. Civ. P. 65(a) ............................................................................................11

Fed. R. Civ. P. 65(b)............................................................................................24

Plaintiff Investment Property Realty Group, LLC ("IPRG") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction against Defendants Sean Mashihi, Gabriel Kates, Daniel Shawah, Serge Sarkisian (collectively "Individual Defendants") and Block Real Estate Group LLC ("Block").

## PRELIMINARY STATEMENT

IPRG, a prominent New York commercial real estate brokerage, seeks the immediate protection of the Court from brazen acts of theft. Last week, IPRG learned that former IPRG agents Sean Mashihi, Gabriel Kates, and Daniel Shawah conspired with Serge Sarkisian to steal highly valuable, non-public data from IPRG's unique and proprietary shared information database (the "SID"). The data stolen by Defendants from IPRG's SID—which IPRG has spent years compiling, at a cost of well over $1 million—includes highly confidential customer lists and preferences, sophisticated market analyses, valuable owner-decisionmaker contact information (which is often blanketed in corporate anonymity, behind real estate holding companies), pending listing offers, off-market listings and deals (i.e., sensitive sale information before it hits the market), historical property notes, and market conditions.

IPRG's SID is curated and maintained by two full-time IPRG employees, four outsourced data analysts, and an external database architect, who are supervised by an IPRG executive. Working together, these individuals mine, refresh, and slice market information in search of data that will have maximum impact in identifying buyers and sellers, and predicting their behaviors. This unique database is the nerve center of IPRG's business strategy and activities, and has allowed IPRG to differentiate itself in the market, rapidly attract talent, and gain market share. IPRG takes extensive measures to protect this valuable non-public data from disclosure, and requires all of its personnel—including Mashihi, Kates, Shawah, and Sarkisian—to enter into confidentiality and non-disclosure agreements with IPRG.

Most IPRG personnel—including brokers and agents like Mashihi, Kates, and Shawah—do not have access to IPRG's raw data stored on the SID, and instead have limited access to the data through a SalesForce platform. But Sarkisian, a database analyst, had access to raw data exports as part of his regular work related to database operations.

In sum, IPRG's evidence in support of this motion shows:

- On May 17, 2022—while still engaged as IPRG brokers—Mashihi and Kates formed a competing commercial real estate brokerage, Defendant Block Real Estate Group LLC, before leaving IPRG on June 30 and July 6, 2022, respectively. Separately, Shawah left IPRG on October 3, 2022 to work for another IPRG competitor, Lee & Associates.

- Sarkisian admitted to IPRG's management that he transferred IPRG's data to Mashihi, Kates, and Shawah before they departed from IPRG, but falsely claimed the transfers were "routine," and that he had sent the data to the other three using his work email.

- In truth, Sarkisian had apparently set up a black market for IPRG's data, and was paid a sum of money in exchange for downloading and transferring the spreadsheets containing IPRG's stolen data. The dates of these downloads coincided with the departures of Mashihi, Kates, and Shawah.

- Sarkisian also used an external drive to transfer the data—not his work email. In an attempt to conceal his theft, Sarkisian downloaded the spreadsheets to an external folder labeled "Private Wedding Photos"—but Sarkisian is single, and lives with his parents.

- Block, through its principals Mashihi and Kates, has recently attempted to target IPRG's clients, and solicit IPRG's brokers, in violation of Mashihi and Kates' contractual promises to IPRG. While soliciting IPRG's brokers, Mashihi and Kates shamelessly

touted that Block possessed IPRG's SID data—**which they had stolen from IPRG**—and that Block was using the pilfered data to target IPRG's clients.

- On October 17, 2022—after IPRG's counsel sent a cease and desist letter to Shawah—an email blast announcing that Shawah had joined IPRG competitor Lee & Associates was sent to email addresses Shawah stole from IPRG's SID. Lee & Associates' in-house counsel confirmed to IPRG's counsel that Shawah had procured an external drive containing large quantities of IPRG client data.

Like so many others over the years, IPRG gave Defendants Mashihi, Kates, and Shawah the opportunity to build wealth and reputation as commercial real estate brokers by giving them resources, including limited access to parts of the IPRG database through a Salesforce interface that did not allow access of raw data. Defendants returned that trust and opportunity with theft. Rather than build a reputation and market share through their own ingenuity and hard work like IPRG's founders, Defendants resolved to steal IPRG's intellectual property and poach IPRG brokers to siphon off IPRG's central business assets and goodwill for their own self-dealing.

The federal Defend Trade Secrets Act, IPRG's contracts with Defendants, and New York common law protect IPRG from Defendants' brazen acts of corporate sabotage. Emergency relief is needed to protect further harm while Defendants are held to account for their actions.

## STATEMENT OF FACTS

### A. Overview of IPRG's Real Estate Brokerage Business

Founded in 2015 as Bestreich Realty Group, IPRG is a market leading real estate investment sales brokerage and advisory firm in the commercial real estate market in the New York City metropolitan area. (Compl., ¶ 22.) IPRG has an established and well-known reputation as a trusted source in brokerage with an in-depth, block-by-block, knowledge of the New York City investment market. (*Id.*, ¶ 23.)

Since its founding, IPRG has completed more than 500 sales across the five boroughs exceeding $1 billion in value, servicing buyers and sellers in New York City and from across the country and globe. (*Id.*, ¶ 24.) IPRG specializes in the sale and advisory of multifamily, mixed-use, and development-site properties. (*Id.*, ¶ 25.) IPRG's expert brokers provide strategic guidance to best navigate sales and leasing processes to achieve optimal results for clients, as well as transparent and accurate property valuations for property owners to unlock the true value of their investment. (*Id.*, ¶ 26.)

**B.      IPRG's Shared Information Database ("SID")**

IPRG's success is attributable to its in-depth proprietary database, which equips its brokers and salespersons with premier market intelligence needed to be the most educated in the commercial real estate market. (*Id.*, ¶ 27.) IPRG's platform utilizes a combination of people and technology, giving clients resources they need to achieve their real estate goals. (*Id.*, ¶ 28.) One of IPRG's key points of differentiation from its competitors is IPRG's proprietary shared information database ("SID") that it built over years, which allows its entire brokerage team to input and track sales and property records, including in depth and accurate property ownership information, throughout the New York City area. (*Id.*, ¶ 29.)

The SID is built on a Salesforce® platform and draws from data hosted on IPRG servers both on-site and in the cloud. (*Id.*, ¶ 30.) The SID includes a client relationship manager ("CRM") which tracks clients preferences, non-public client decisionmaker information, potential client interactions, and information and can be used to disseminate potential property sales, recent successes, or other marketing information to targeted audiences generating meaningful business. (*Id.*) The SID is so extensive and sprawling that IPRG employs several full-time staff to curate and administer the SID for various IPRG business initiatives, as well as four outsourced data analysts, who analyze and scrub data to ensure accuracy, and an external consultant who manages the

architecture of the database, and an IPRG executive responsible for overseeing database management. (*Id.*, ¶ 31; *see* Oct. 19, 2022 Declaration of Derek S. Bestreich ("Bestreich Decl."), ¶¶ 12-26.)

The SID is valuable to both clients and IPRG because with this comprehensive set of proprietary data, from owner histories, potential owner interest, prior feedback from owner or buyer interactions over years, non-public IPRG broker notes, existing outstanding offers designating imminent potential sales, and more. (Compl., ¶ 32.) An IPRG broker can run queries or reports on the SID for anything a client requests, whether a mixed-use property in a specific neighborhood or access to a network of buyers and capital. (*Id.*, ¶ 33.) IPRG through its SID can make unique matches between buyers and sellers in the market and create opportunities and successful transactions seamlessly. (*Id.*) With its SID, IPRG brokers who get a listing have the cutting-edge, insider, information they need to make a sale, in a user-friendly compilation that maximizes efficiency. (*Id.*) The value of this information depends on its confidentiality and use by IPRG personnel only. (*Id.*)

### C. IPRG's Protection Of Its Valuable Business Assets

#### 1. The Sales Associate Independent Contractor Agreement

IPRG agents, including Defendants Mashihi, Kates, and Shawah, are required as a condition of engagement with IPRG to execute Sales Associate Independent Contractor Agreements ("Associate Agreements"). Copies of Defendants Mashihi, Kates, and Shawah's Associate Agreements are attached to the Verified Complaint as Exhibits 1-3. The Associate Agreements contain provisions restricting the Individual Defendants from using or disclosing IPRG's proprietary, confidential, trade secret information, as well as restrictions on their solicitation of IPRG personnel for 12 months following termination of employment. (Compl., ¶¶ 35-43, Exs. 1-3.)

## 2. The Confidentiality and Inventions Agreement

Non-broker employees of IPRG, including IPRG's "Data Entry Specialist," Defendant Sarkisian, are required as a condition of employment to execute Confidentiality and Inventions Agreements (the "Confidentiality Agreement"). A copy of Defendant Sarkisian's Confidentiality Agreement is attached to the Verified Complaint as Exhibit 4. The Confidentiality Agreement contains similar restrictions about confidentiality and disclosure of information as the Associate Agreements. (Compl., ¶¶ 44-47.)

## 3. The IPRG Policy Manual

IPRG also issues to its brokers a "Policy Manual: Independent Contractor Sales Associates" (the "Broker Manual") and to its employees, a "Policy Manual: Employees" (the "Employee Manual") copies of which are attached to the Verified Complaint as Exhibits 5 and 6. The Broker Manual expands upon the competitively sensitive nature of IPRG's valuable proprietary, confidential, and trade secret information to which its brokers have access and the restrictions on their disclosure and use. (*Id.*) The Broker Manual also includes detailed provisions on the use, handling, and storage of IPRG's business information, stating, *inter alia*, that "confidential or proprietary information should be stored on [the IPRG] network, which provides safeguards for protecting information, and should not be stored on a local hard drive, desktop, disk, or portable drive."(*Id.*) The Broker Manual also lists various precautionary measures that "must also be taken in regards to the physical security of [IPRG]'s information technology that may contain confidential information." (*Id.* at 13 (listing measures). Like the Broker Manual, the Employee Manual contains detailed provisions regarding the protection of IPRG's proprietary, confidential, and trade secret business information. *(Id.)*

### 4.    Protection of IPRG's Physical Office and Computer Network

To protect its proprietary, confidential, and trade secret business information, IPRG has implemented numerous physical security measures. For example, IPRG's physical facilities are locked and monitored by 24-hour security systems. Entry to and exit from IPRG facilities are controlled, and access is allowed only to authorized individuals. (Compl., ¶ 54.) IPRG's electronic records and information are accessible via IPRG's secure computer network. Access to that network is limited to IPRG personnel and the network is password protected and monitored by IPRG. (*Id.*, ¶ 55.)

### 5.    The Individual Defendants' Employment History with IPRG

Defendants Mashihi, Kates, and Shawah each were engaged by IPRG as sales associates or brokers. (Compl, ¶ 56; Bestreich Decl. ¶¶ 3-9.) Each regularly relied on IPRG's proprietary, confidential, and trade secret information, including the SID, to perform their duties as IPRG brokers. (Compl, ¶ 57; Bestreich Decl. ¶¶ 12-26.) Defendant Mashihi worked as an IPRG broker from February 22, 2021 until June 30, 2022, when he resigned. Mashihi focused primarily on multifamily and mixed-use properties while with IPRG. (Compl, ¶ 58; Bestreich Decl. ¶ 5.) Defendant Kates worked as an IPRG broker from December 7, 2017 until July 6, 2022, when he resigned along with Defendant Mashihi. Kates's primary focuses at IPRG were multifamily, mixed-use, and development site properties. (Compl., ¶ 59; Bestreich Decl. ¶ 6.) Defendant Shawah worked as an IPRG broker from January 2, 2019 until October 3, 2022, when he, too, resigned from IPRG, by verbally informing IPRG's principals as soon as they arrived at the office of his intent to leave. Shawah covered multifamily, mixed-use, and development site properties. (Compl., ¶ 60; Bestreich Decl. ¶ 8.) Defendant Sarkisian was employed as an Investment Analyst with IPRG from March 8, 2016 until he was involuntarily terminated on October 13, 2022, following discovery of his wrongdoing as described herein. As an Investment Analyst, Sarkisian

was responsible for curating the SID and organizing and exporting data for use on IPRG marketing blasts. Sarkisian was primarily responsible for data entry, data integrity, and data maintenance for the SID. (Compl., ¶ 61; Bestreich Decl. ¶ 9.)

**D.    Mashihi and Kates Form a Competing Brokerage, Block Real Estate Group**

Upon information and belief, Defendants Mashihi and Kates formed a competing commercial real estate brokerage, Block, on May 17, 2022, while they were still engaged as brokers by IPRG. (Compl., ¶ 62; Bestreich Decl. ¶ 7.) According to Block's website (www.blocknewyork.com), Mashihi and Kates are "Co-Founders" and "Managing Principals" of Block. (Compl., ¶ 63; Bestreich Decl. ¶ 7.)

Since Defendants Mashihi and Kates left IPRG to dedicate themselves full-time to Block, they have solicited other IPRG brokers to join them at Block in patent violation of their non-solicitation obligations in their respective Associate Agreements, as explained in detail below. They, in fact, hired away from IPRG a broker at the outset of their new venture. (Compl., ¶ 64.)

On October 3, 2022, Defendant Shawah resigned from IPRG to join another competing brokerage. (Compl., ¶ 65.) IPRG is informed and believes that Defendants Mashihi and Kates, are actively soliciting IPRG brokers to join Block, boasting of higher commission splits and making what appeared to be an outrageous claim that they had in their possession IPRG's valuable, proprietary, confidential and trade secret database, the SID. (Compl., ¶ 66.)

Block has sold one or more transactions that IPRG previously was actively brokering prior to their sale through Block. (Compl., ¶ 67.) Upon information and belief, Defendants have brokered the sale of multiple properties utilizing the IPRG's confidential and trade secret information, including the SID, and are actively marketing and selling properties using this information. (Compl., ¶ 68.)

**E.     IPRG Learns of Defendants' Intentional and Unlawful Scheme to Steal IPRG's Proprietary, Confidential, and Trade Secret Information**

Just last week, IPRG first learned of a concerted scheme by Mashihi, Kates, and Shawah to conspire with Sarkisian to download and steal IPRG's proprietary, confidential, and trade secret information, including, without limitation the IPRG SID to utilize for the benefit of each of them and IPRG's competitors, including Block. (Compl., ¶ 69; Bestreich Decl. ¶¶ 27-46.) Upon information and belief formed from discussions with direct witnesses and a review of IPRG records, Block proceeded to solicit (and upon information and belief, is continuing to solicit) multiple IPRG brokers to leave IPRG by explicitly pitching Block's access to IPRG's proprietary, confidential, and trade secret database, the SID, which Block bragged was procured through IPRG's Investment Analyst, Sarkisian for a cash sum. The circumstances surrounding the export and saving of the SID data reveals an intentional malicious scheme. (Compl., ¶ 70.)

Sarkisian arrived at IPRG's offices on October 3, 2022 at 6:33 A.M. as reflected by key fob data. An investigation reveals Sarkisian proceeded to download various database runs from SID, including onto external jump drive and onto a computer, marked in a folder inaccurately denoted "Private Wedding Photos"—an explicit effort to hide the contents of the file. These files were then deleted from the computer and the reports were deleted from Salesforce by Sarkisian. (Compl., ¶ 70.)

Upon learning of these activities, IPRG immediately confronted Defendant Sarkisian, who admitted that both Defendants Kates and Shawah had approached him before their respective resignations on July 6, 2022 and October 3, 2022, respectively, asking that he email data from the SID to them, which Sarkisian admitted he did. Sarkisian claimed he had emailed certain files on IPRG emails to Kates and Shawah (a search of the IPRG emails revealed no such emails, contradicting Sarkisian's claims). (Bestreich Decl. ¶¶ 34-42.) Sarkisian further admitted that he

"hangs out" with the Individual Defendants regularly following their IPRG departure, including as recently as the preceding night he had been at Kates' Ludlow Street apartment "watching movies and playing video games." (Compl., ¶ 71; Bestreich Decl. ¶¶ 34-42.) IPRG terminated Defendant Sarkisian on Thursday, October 13, 2022. (Compl., ¶ 72; Bestreich Decl. ¶ 45.)

IPRG also conducted an initial investigation of the information within its possession and control, revealing unauthorized and unusual exports from the SID and download data on IPRG computers, as well as clear appropriation of data in the Salesforce® audit logs. (Compl., ¶ 73; Bestreich Decl. ¶¶ 34-42.) This initial investigation revealed downloads, outside the ordinary course of business, of substantial data from the SID on June 28, 2022—immediately preceding Defendants Mashihi and Kates' resignations from IPRG—with updated and supplemental files downloaded on September 7, 2022, September 30, 2022 and October 3, 2022. A screenshot of the data exports from Defendant Sarkisian's IPRG workstation is attached to the Verified Complaint as Exhibit 7. (Compl., ¶ 74; Bestreich Decl. ¶¶ 34-42 and Ex. A.)

The June 2022 downloads from the SID were stored as "Private Wedding Photos" on Defendant Sarkisian's IPRG workstation. None of the files so stored consist of wedding photos and, upon information and belief, Mr. Sarkisian is not married and lives at home with his parents. (Compl., ¶ 75; Bestreich Decl. ¶¶ 34-42.) The downloaded files also showed that they had been exported to a "D Drive." IPRG does not have a "D Drive" and believes that Defendant Sarkisian and his co-Defendants and co-conspirators used portable external drives or "jump drives" to steal IPRG's proprietary, confidential, and trade secret information and remove it from IPRG's offices. (Compl., ¶ 76; Bestreich Decl. ¶¶ 34-42.) IPRG's initial investigation further revealed that, on October 3, 2022—the day of Defendant Shawah's resignation from IPRG—Defendant Sarkisian downloaded files from the SID between 7:48 a.m. and 8:38 a.m. and saved them as "Private

Wedding Photos." Defendant Sarkisian's shift at IPRG was from 9:00 a.m. to 5:00 p.m. and he was not an employee who ever arrived this early for work in the normal course as can be verified from his key fob entry history. (Compl., ¶ 77; Bestreich Decl. ¶¶ 34-42, Ex A.)

### F. IPRG Cease and Desist Letters to Defendants

On Thursday, October 13, 2022, IPRG delivered by email and overnight delivery cease and desist letters to each of the Defendants demanding, among other things, that they:

- Cease and desist any further violation of their contractual obligations to IPRG, including solicitation of IPRG brokers and employees;

- Identify all IPRG business information in their possession, custody or control;

- Identify all persons to whom they have disclosed IPRG's business information; and

- Identify all listings, proposed listings, offers, and transactions in which they have used or otherwise relied upon IPRG business information.

(October 19, 2022 Declaration of Craig M. Flanders, Esq. ("Flanders Decl.") Ex. 1)

IPRG advised each Defendant of their duty to preserve relevant information and demanded that they comply with IPRG's demands by Tuesday, October 18, 2022. (*Id.*) IPRG warned Defendants that their failure to comply with IPRG's demands would result in IPRG bringing legal action against them to protect its rights. (*Id.* )

None of the Defendants complied with IPRG's demands. (*See* Declaration of Craig Flanders.) In fact, defiantly, following receipt of the cease and desist, Shawah blasted the market with emails, utilizing the IPRG stolen CRM to target recipients, with a promotional email announcing that his new employer "is pleased to welcome DANIEL SHAWAH as a senior broker specializing in Investment Sales." This email blast went to the personal email account of an IPRG principal, which private email address was only available on IPRG's SID. IPRG has confirmed

with several clients that they, too, received this email blast from Shawah. (Compl., ¶ 82; Bestreich

Decl. ¶ 46.)

## ARGUMENT

District courts "enjoy broad discretion in fashioning temporary equitable remedies," which

includes preliminary injunctions under Federal Rule of Civil Procedure 65(a). *Koylum, Inc. v.*

*Peksen Realty Corp.*, 272 F.3d 138, 147 (2d Cir. 2001). In the Second Circuit:

> District courts may ordinarily grant preliminary injunctions when
> the party seeking the injunction demonstrates (1) that he or she will
> suffer irreparable harm absent injunctive relief, and (2) either
> (a) that he or she is likely to succeed on the merits, or (b) that there
> are sufficiently serious questions going to the merits to make them
> a fair ground for litigation, and that the balance of hardships tips
> decidedly in favor of the moving party.

*Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotations

omitted).

The Defend Trade Secrets Act ("DTSA") specifically authorizes this Court to grant an

injunction "to prevent any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(a)(i).

District courts routinely grant preliminary injunctions in DTSA cases when presented with facts

virtually identical to this case. *See, e.g.*, *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-

6545 (KAM), 2021 U.S. Dist. LEXIS 230156, at *15 (E.D.N.Y. Dec. 1, 2021) (granting

preliminary injunction in DTSA case against ex-employee of auto broker who stole database of

customer information to compete with prior employer for broker clients); *Capstone Logistics*

*Holdings, Inc. v. Navarrete*, No. 17-cv-4819 (GBD), 2018 U.S. Dist. LEXIS 216940, at *98

(S.D.N.Y. Oct. 25, 2018) (granting preliminary injunction in DTSA case where employee

downloaded financial and customer data of ex-employer to personal computer); *Entegee Inc. v.*

*Korwek*, No. 3:15-cv-1087 (VLB), 2015 U.S. Dist. LEXIS 118263 (D. Conn. Sept. 4, 2015)

(granting preliminary injunction where former employee downloaded and emailed himself confidential data and trade secrets).

The injunction elements are easily met under the well-worn caselaw in this familiar factual scenario. The Defendants stole IPRG's valuable, proprietary, confidential, and trade secret information, intentionally ignoring various restrictive covenants and (haphazardly) seeking to cover their tracks, in order to benefit themselves and their competing business in plain violation of federal and state law.

## I. It is Highly Likely that IPRG Will Succeed On Its Underlying Claims

"A preliminary injunction movant need not show that success is an absolute certainty. [Movant] need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). As detailed below, IPRG's likelihood of succeeding on the underlying merits of its claims far exceeds this threshold.

Counts V and VI of the Verified Complaint assert misappropriation claims against Defendants under the Defend Trade Secrets Act (18 U.S.C. § 1836) and New York common law, respectively. "To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing 18 U.S.C. § 1836(b)(1)). "The elements for a misappropriation claim under New York law are fundamentally the same." *Id.* (citation omitted); *ExpertConnect, L.L.C. v. Fowler*, No. 18 CIV. 4828 (LGS), 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019). Thus, by "sufficiently plead[ing] a DTSA claim" a party "also states a claim for misappropriation of trade secrets under New York law." *Id.* at *7.

## A.  IPRG's SID, and the information contained therein, are "trade secrets" under the DTSA and New York law

Under the DTSA, "trade secret" is defined as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . [so long as:] **(A)** the owner thereof has taken reasonable measures to keep such information secret; and **(B)** the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C § 1839(3); *see Iacovacci*, 437 F. Supp. 3d at 380-81; *see also Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK), 2015 U.S. Dist. LEXIS 133650, at *89 (S.D.N.Y. Sep. 30, 2015) (information "had independent economic value . . . because it was not publicly available, and without maintaining control of its customer information, the manufacturers or someone else could use that information to steal the business").[1]

---

[1] Similarly, New York law defines a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 407 (1993). In evaluating whether information is a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others[.]

*Ashland*, 82 N.Y. 2d at 407 (citation omitted). "These factors are guideposts, not elements, and it is not necessary to plead every single factor to state a claim." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015) (quotation and citation omitted); *see, e.g., ExpertConnect, LLC*, 2019 WL 3004161, at *4 ("reasonable measures" include NDAs and password protection); *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) ("reasonable measures" include requiring "customers, partners, vendors and employees to enter into nondisclosure agreements" and prohibiting "unauthorized email transfers of company documents").

### 1. IPRG takes extensive measures to secure, and maintain the confidentiality of, information stored on the SID

IPRG takes extensive steps to protect the information on the SID from unauthorized disclosure and dissemination to its competitors:

**Physical and digital security and 24-hour surveillance.** 'Both IPRG's computer networks and physical office are safeguarded by network passwords, physical locks, and a 24-hour security system, among other measures." (Bestreich Decl., ¶ 26.)

**Limited access to raw data.** "Most IPRG personnel—including rank-and-file brokers and agents like Mashihi, Kates and Shawah—do not have access to the raw SID data exports, and instead interface with the information through a SalesForce platform, which provides limited access to teams based on the geographic segment that team services. Two factor authentication is needed even to access this limited interface." (*Id.*, ¶ 24.)

**Restrictive covenants.** "IPRG agents, including Defendants Mashihi, Kates, and Shawah, are required as a condition of engagement with IPRG to execute Sales Associate Independent Contractor Agreements," which "contain provisions designed to protect IPRG's investments in both its valuable human resources and its proprietary, confidential, and trade secret information." (Compl. ¶¶ 36-43 & Exs. 1-3.) "Non-broker employees of IPRG, including IPRG's 'Data Entry Specialist,' Defendant Sarkisian, are required as a condition of employment to execute Confidentiality and Inventions Agreements," which "also contains a provision requiring IPRG employees to return and not retain IPRG' Confidential Information following termination of employment." (*Id.* ¶¶ 44-47 & Ex. 4.)

**Policies and procedures.** The Broker Manual issued to Defendants Mashihi, Kates, and Shawah, and the Employee Manual issued to Defendant Sarkisian, further elaborates on IPRG's

directive that confidential information be safeguarded from competitors, and describes the irreparable harm that could befall IPRG in the event of an unauthorized disclosure. (*Id.* ¶¶ 48-53.)

### 2. Information stored on the SID gives IPRG a competitive advantage because IPRG's competitors do not have access to the information

It well settled that compilations of potential client information (in this case buyers and sellers), with non-public details like preferences or transaction history, constitute trade secrets. *Plaza Motors of Brooklyn, Inc.*, 2021 U.S. Dist. LEXIS 230156, at *15 (granting injunction in DTSA case against ex broker employee, finding employer "devoted substantial effort over the course of decades to build and maintain databases containing information about all of its customers. This information, including the type, model year, and price for every car that each customer has bought or leased, is not readily ascertainable through public sources and its secrecy provides independent economic value"); *see N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999) (affirming injunction and holding, "where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply"); *Jinno Int'l Co. v. Premier Fabrics, Inc.*, No. 12-CV-7820, 2013 WL U.S. Dist. LEXIS 129745, at *13 (S.D.N.Y. May 24, 2013) ("A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure").

In *Capstone Logistics Holdings*, an employee accessed his employer's database to steal confidential information about pricing, customer contact lists, and other business information. 2018 U.S. Dist. LEXIS 216940, at *93-94. This Court granted an injunction to the employer, finding: "[u]nder the DTSA, this is precisely the kind of information that provides [plaintiff] with a competitive advantage and is considered a trade secret under the DTSA." *Id.*

Here, IPRG has invested substantial time and money into building the SID, a unique and highly sophisticated proprietary database. (Bestreich Decl. ¶ 15.) The SID stores valuable non-public information and analysis about potential IPRG clients that is constantly updated for accuracy, and which cannot be replicated by third parties. (*Id.*, ¶ 16.) This data includes "a compilation of [IPRG's] clients and their preferences, as well as valuable owner contact information" (*id.*, ¶ 17), and "private broker notes and intelligence on owner and buyer preferences" (*id.*, ¶ 18). Of particular value to IPRG is contact information for "owner-decisionmakers." Since title owners in the commercial real estate industry are often entities, the human beings who are actually responsible for making purchase and sale decisions usually cannot be readily ascertained by searching public sources. (*Id.*, ¶ 17.) "Using years of research, the SID contains information-end decisionmakers with contact information, allowing [IPRG's] brokers to communicate with both owners and potential buyers easily." (*Id.*)

## B. The Defendants Misappropriated IPRG's Trade Secrets.

To demonstrate "misappropriation" under the DTSA, a party must show:

> an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.

*Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016); *see* 18 U.S.C. § 1839(5).

Acquisition of a trade secret through "improper means" includes "theft" and "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). Disclosure or use of a trade secret is also prohibited when the disclosure or use is done by a person who "knew or had reason to know" that the trade secret was derived from a person who either used improper

means to acquire it, or "owed a duty to the person seeking relief to maintain the secrecy of the trade secret." *Id.* § 1839(5)(B)(ii)(I) & (III).

Here, the Individual Defendants' conduct violates the DTSA, as they each breached a duty to maintain secrecy under their respective agreements with IPRG, and their common law fiduciary duties as agents. (*See* Bestreich Decl. ¶¶ 27-46.) Their activities clearly constitute misappropriation under prevailing caselaw. *See Kraus USA, Inc.*, 2020 WL 2415670, at *6 (DTSA violated where "employee personally downloaded information from a proprietary system covered by a confidentiality agreement" and shared that information with others); *AUA Private Equity Partners, LLC v. Soto*, No. 1:17-cv-8035-GHW, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (DTSA violated where employee uploaded "trade secrets from her work laptop to her personal cloud-based storage without . . . permission and in direct violation of the confidentiality agreements that she signed"); *Medidata Sols., Inc.*, 2018 WL 6173349, at *4 (DTSA violated when employees "retained [plaintiff's] documents marked 'Private and Confidential' upon joining [defendant and] sent documents containing trade secrets to their personal emails close to their departure from [plaintiff] to join [defendant]" in breach of plaintiff's policies and confidentiality agreements).

Even at this initial stage of this case, the evidence of Defendants' theft and misappropriation of IPRG's trade secrets is palpable. IPRG's management learned that not only were Mashihi and Kates attempting to solicit IPRG's employees in violation of their restrictive covenants, they boasted that Block had acquired IPRG's confidential SID data. (Bestreich Decl. ¶ 28.) Individual Defendants' procurement of the SID data has already been corroborated by Defendant Sarkisian, who admitted before his termination that he provided information from the SID to Defendants Kates and Shawah (though he misrepresented the nature, scope and context of that dissemination) before their respective resignations in July and October 2022. (*Id.*, ¶ 34.)

Through its own investigation, IPRG has verified that Defendant Sarkisian downloaded to an external drive IPRG's proprietary, confidential, and trade secret information immediately preceding the resignations of Defendants Mashihi, Kates, and Shawah, and hid them in a folder entitled "Private Wedding Photos," even though Defendant Sarkisian is unmarried. (*Id.*, ¶ 41.) As recently as this week, Shawah used IPRG's confidential client contact data to send marketing information to IPRG's clients. (*Id.*, ¶ 46 & Ex. C.)[2]

IPRG is highly likely to succeed on its misappropriation of trade secrets claims under the DTSA and New York common law.

### C.      IPRG is Highly Likely Like to Prevail on the Breach of Contract Claims

In Counts I-IV of the Verified Complaint, IPRG asserts claims for breach of confidentiality and nondisclosure, and non-solicit provisions in the restrictive covenant agreements signed by each of the Individual Defendants. (Compl. ¶¶ 84-99.) The use and dissemination of this information clearly violated the unambiguous terms of the parties' agreements. (*See id.*, ¶¶ 36-47 & Exs. 1-4.) Accordingly, IPRG's contract claims are also likely to prevail on the merits. *Johnson v. Nextel Communs., Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (elements of breach of contract claim are enforceable contract, full performance, breach, and damages).

---

[2] Although there is clear evidence of a disclosure here, an injunction is appropriate even in the absence of an actual disclosure under the "inevitable disclosure" doctrine. *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006). The "inevitable disclosure" factors include:

> (1) the extent to[] which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Payment Alliance Intl., Inc. v. Ferreira*, 530 F Supp. 2d 477, 482 (S.D.N.Y. 2007) (granting injunction based on inevitable disclosure where ex-employee went to work in a similar capacity for competitor and information would be valuable to competitor).

Here, Individual Defendants are already working for IPRG's direct competitors (Lee & Associates and Block), in the same positions (commercial real estate brokers).

### D. IPRG Is Highly Likely to Succeed on the Merits of Its Claims for Breach of Personnel Non-Solicitation Covenants

"New York recognizes the enforceability of covenants not to solicit employees" and will enforce them through injunction. *See, e.g.*, *Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001) (granting TRO and then preliminary injunction for violations of non-solicit provisions). Like covenants not to compete and customer non-solicitation covenants, New York courts enforce personnel non-solicitation covenants to the extent the restrictions are (1) no greater than is required for the protection of the legitimate interest of the employer, (2) do not impose an undue hardship on the employee, and (3) do not injure the public. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999); *Renaissance Nutrition Inc. v. Kurtz*, 2012 U.S. Dist. LEXIS 2490, *8 (W.D.N.Y. 2012).

Non-solicitation of personnel and no-hire provisions are generally viewed as more reasonable and less burdensome than other restrictive covenants because the departing employee or agent is not precluded from pursuing his or her livelihood. *See Genesee Val. Trust Co. v. Waterford Group, LLC*, 130 A.D.3d 1555, 1558 (4th Dep't 2015) ("A covenant not to solicit employees is 'inherently more reasonable and less restrictive' than a covenant not to compete[.]"). As a result, most New York courts analyzing non-solicitation of personnel or no-hire provisions have focused primarily on whether the provisions protect a legitimate interest of the employer.

Here, the personnel non-solicitation provisions in each of the Individual Defendants' agreements with IPRG are reasonable and enforceable. The "Non-Interference" provision of IPRG's Broker Agreements with Defendants Mashihi, Kates, and Shawah acknowledges IPRG's need to "protect[] . . . its investment in its relationships with its independent contractors and employees," and merely restricts them for a period of twelve (12) months following termination

of employment from soliciting IPRG personnel who were engaged by IPRG during the time that they, too, were so engaged. (*See id.*, ¶¶ 36-47 & Exs. 1-4.)

This 12-month restriction is well-within the scope of temporal reasonableness for restrictive covenants recognized under New York law and applies only to each Individual Defendant's co-workers while they were engaged by IPRG.[3] The personnel non-solicitation provisions in each of the Individual Defendants' restrictive covenant agreements are not harmful to the general public nor are they unduly burdensome on the Individual Defendants. Each Individual Defendants is free to apply his skills in the commercial real estate market, but none can do so using IPRG's proprietary, confidential, and trade secret information or by poaching IPRG personnel with whom they worked for at least 12 months following the termination of their engagements with IPRG.

Here, the evidence of the Individual Defendants' breaches of their personnel non-solicitation covenants is also clear. Defendants Mashihi and Kates formed Defendant Block together while they were still engaged by IPRG and left IPRG together on July 5, 2022 to dedicate themselves to Defendant Block's competing brokerage business. (Compl. ¶¶ 62-68.) Since their departure from IPRG, Defendants Mashihi and Kates have continued to solicit other IPRG brokers

---

[3] *See Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007) (two year restriction on competition reasonable and granting preliminary injunction prohibiting former employee from "working at, or providing services for, Cynergy Data, Inc., or any other direct competitor of PAI within the continental United States for a period of two years"); *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 199 (E.D.N.Y. 1999) (two year restriction); *IBM Corp. v. De Freitas Lima*, No. 7:20-CV-04573 (PMH), 2020 WL 5261336, at *7 (S.D.N.Y. Sept. 3, 2020), *aff'd*, 833 F. App'x 911 (2d Cir. 2021) ("IBM has demonstrated a likelihood of success on the merits on its claim that Defendant breached the Non-Compete by accepting a job with an IBM competitor in a geographic area in which he had job responsibilities within the last twelve months that 'could result' in his use, disclosure, and/or reliance upon Plaintiff's trade secrets and confidential information for the benefit of Plaintiff's competitor."); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 728 (S.D.N.Y. 1995) ("the covenant was of relatively short duration, precluding Barton from using any privileged information or engaging in a competing business for twelve months from the date his employment terminated").

and personnel to join them at Defendant Block. (Bestreich Decl. ¶¶ 27-28.) At least one IPRG agent, Kyle Katz, was successfully poached to directly join Block. (*Id.*, ¶ 29.)

## II.    IPRG Will Continue to Suffer Irreparable Harm Absent Injunctive Relief

In this Circuit, courts recognize that the loss of trade secrets constitutes irreparable injury. *FMC Corp. v. Taiwan Tainan Giant Industrial Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("the loss of trade secrets cannot be measured in money damages . . . A trade secret once lost is, of course, lost forever."). Moreover, the "[t]hreatened dissemination of trade secrets generally creates a presumption of irreparable harm." *Secured Worldwide LLC v. Kinney*, No. 15 Civ. 1761(CM), 2015 WL 1514738, at *11 (S.D.N.Y. Apr. 2015). Indeed, "irreparable harm is presumed where a trade secret has been misappropriated, even in the absence of an employment agreement[.]" *Johnson Controls, Inc. v A.P.T. Critical Sys.*, 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004). Thus, for good reason, in enacting the DTSA, Congress expressly wrote into the governing statute that a court may grant an injunction "to prevent any actual or threatened misappropriation," including "requiring affirmative actions to be taken to protect the trade secret," because of the inherent likelihood of irreparable harm. 18 U.S.C. § 1836(b)(3)(A)(i)-(ii).

Here, absent injunctive relief the Defendants can utilize the Trade Secrets to target and ultimately attract business away from IPRG in a manner that will be difficult if not impossible to trace, and whose true impact for hears to come is unknown. *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Human Servs.*, 510 F. Supp. 3d 29, 40 (S.D.N.Y. 2020) ("Courts have determined that a loss of existing business and a decline in the opportunity for new business may qualify as irreparable harm"); *Ericmany Ltd. v. Agu*, 2016 U.S. Dist. LEXIS 73016, 2016 WL 8711361, at *3 (E.D.N.Y. June 3, 2016) (quotations and citation omitted) ("Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of

business over years to come are . . . hard to measure in dollars and are properly considered irreparable harm.")

Based on the evidence presented in IPRG's Verified Complaint and accompanying Declaration of Derek Bestreich, it is evident that the Defendants coveted IPRG's valuable, proprietary, confidential, and trade secret information, that they stole it, and that they are now using it to benefit themselves and to the detriment of IPRG. Under the law, IPRG is entitled to injunctive relief to prevent irreparable harm.

## III. The Balance of the Equities and Public Interest Weigh Heavily In Favor of Injunction

"A defendant's misconduct . . . may tip the balance of equities in favor of an injunction." *Secured Worldwide LLC v. Kinney*, 2015 U.S. Dist. LEXIS 44730, at *58 (S.D.N.Y. Apr. 1, 2015). Here, the facts show a pattern of outrageous and intentional illegal conduct (including efforts to cover up the wrongdoing) by Defendants, all coordinated and conceived with the express goal of advancing their own interests at the expense of IPRG. In the absence of an injunction, IPRG could lose current and prospective clients as Defendants exploit the SID and related information stolen from IPRG to IPRG's detriment.

IPRG merely seeks to restrict the Defendants from using and further disclosing the trade secret information they stole from IPRG and to otherwise abide by their contractual obligation not to solicit IPRG personnel. No request is made to restrain existing personnel continuing employment at a new employer. The Defendants are otherwise free to go about their business. They just should not be able to do so using stolen property and by breaching reasonable contractual obligations.

An injunction will also serve the public interest "because it upholds the law that protects . . . trade secrets." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 2021 WL

1553926, at *13 (S.D.N.Y. Apr. 20, 2021); *see also Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) (public interest served by injunction protecting trade secrets and confidential information).

**IV.     A Temporary Restraining Order and Expedited Discovery Is Needed Pending a Hearing for Preliminary Injunction to Protect IPRG's Interests[4]**

**A.     Temporary Restraining Order on Use of Trade Secrets and Solicitation of IPRG Personnel**

"A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had." Fed. R. Civ. P. 65(b). In trade secret and confidentiality cases, each passing day presents further risk to dissemination and use of the trade secrets, which could irreparably erode the value of the secrets and divert customers and market share in a manner that is difficult, if not impossible, to track.

**B.     Limited Expedited Discovery Should be Directed**

Expedited discovery is appropriate upon a showing of: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

---

[4] Although Federal Rule of Civil Procedure 65 contemplates a bond, no bond is required where, as here, there is no likelihood of any harm, and the injunction is highly likely to prevail. *Plaza Motors of Brooklyn, Inc.*, 2021 U.S. Dist. LEXIS 230156, at *19 ("Defendant has failed to offer any proof of the likelihood of harm, the court declines to require a bond."); *Ime Watchdog, Inc. v. Safa Abdulrahim Gelardi*, No. 22-CV-1032 (PKC) (JRC) 2022 U.S. Dist. LEXIS 86997, at *21 (E.D.N.Y. May 13, 2022) (directing no bond for injunction where the "Court has already concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants, if any, thus would be minimal.")

Expedited discovery is often granted together with an injunction impacting intellectual property because the scope of the infringement is often unknown. *Id.* at 475 (S.D.N.Y. 1990) (granting expedited discovery with injunction impacting trademark and copyright infringement). In recent years, the Court has applied a more flexible approach governed by "reasonableness" and "good cause." *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007).

Here, information regarding the scope of the dissemination of the trade secret information is unknown to IPRG, and exclusively in the possession and control of Defendants. An internal investigation has revealed that Block may have had access certain data sets provided on or around June 28, 2022 and September 30, 2022. IPRG does not know which market interactions or deals Block has engaged in or proposed to engaged in during this time period that may have exposed information to third parties. Similarly, it is unknown to what extent Shawah has disseminated information within Lee & Associates.

Some basic information is needed to properly fashion an injunction that protects the *status quo* by avoiding additional irreparable harm during the pendency of the litigation and the briefing of this motion for preliminary injunction. Accordingly, some initial affidavits and limited deposition testimony addressing facts to help craft the scope of an effective preliminary injunction are requested. The active prior efforts by Defendants to delete evidence of misappropriation reflected in this record raises questions about the degree to which information will be preserved absent expedited discovery, which warrants some limited immediate disclosure. *Delphine Software Int'l v. Elec. Arts, Inc.*, No. 99 CIV. 4454 AGAS, 1999 WL 627413, at *3 (S.D.N.Y. Aug. 18, 1999) (granting plaintiff's application for expedited discovery because there are legitimate concerns that evidence of any misappropriation will disappear . . . possible destruction of documents related to the early development of the game).

**CONCLUSION**

For the reasons set forth herein and in IPRG's accompanying Verified Complaint and related papers, IPRG respectfully requests that the Court:

1.      Issue the Order to Show Cause with the temporary restraining order and expedited discovery set forth in the same, or substantially similar form as the proposed Order to Show Cause submitted with this motion;

2.      Issuing a temporary and preliminary injunction, pursuant to Fed. R. Civ. Proc. 65, enjoying each of the Defendants, as well as their employers, agents, employees, contractors, affiliates, subsidiaries, parents, and all persons acting in concert with any of them, from:

> A.  directly or indirectly using, copying, publishing, disclosing, transferring, alienating, licensing, or selling IPRG's proprietary, confidential, and trade secret information or other confidential proprietary information, including any information forming all or part of the IPRG's 'shared information database' and any other information that may be determined not to be trade secret information and from obtaining any commercial advantage or unjust enrichment from their misappropriation of IPRG's proprietary, confidential, and/or trade secret information through any other acts;

> B.  solicit IPRG employees or independent contractors to terminate their relationship with IPRG or otherwise interfering with IPRG's relationship with their employees or independent contractors; and

> C.  directing that during the pendency of this action from destroying, manipulating, or otherwise altering any evidence, including evidence that may reside on (or be embodied by changes to) any computer system, network, or other electronic means

of data storage or transfer, relating in any way to the matters alleged in this Verified Complaint.

3.     Granting attorneys' fees and costs and such other and further relief as the court deems just.

Dated: New York, New York
     October 20, 2022

**BLANK ROME LLP**

By: /s/ Craig Flanders
    Craig Flanders
    craig.flanders@blankrome.com
    William R. Cruse
    william.cruse@blankrome.com
    Nicholas R. Tambone
    nicholas.tambone@blankrome.com
    1271 Avenue of the Americas
    New York, New York 10020
    Tel.: (212) 885-5000

    *Attorneys for Plaintiff*
    *Investment Property Realty Group, LLC*